PUBLIC SERVICE COMPANY OF INDI-ANA, INC., Plaintiff-Appellant,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Douglas M. Costle, Defendants-Appellees.

No. 81–1241.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 28, 1981.

Decided June 25, 1982.

---

Bryan G. Tabler, Barnes, Hickam, Pant-
zer & Boyd, Indianapolis, Ind., for plaintiff-
appellant.

Patrick J. Cafferty, Dept. of Justice,
Washington, D. C., for defendants-appel-
lees.

Before BAUER and WOOD, Circuit
Judges, and CAMPBELL,* Senior District
Judge.

WILLIAM J. CAMPBELL, Senior Dis-
trict Judge.

Appellant, Public Service Company of In-
diana (hereafter PSI) brought this action in
District Court contesting the appellees', the
Environmental Protection Agency and its

---

* Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

Administrator Douglas M. Costle (hereafter "the EPA," "the agency," or "the Administrator"), acquisition and utilization of certain inspection warrants. The warrants were issued by a United States Magistrate based upon sworn allegations of possible violations of the Clean Air Act, 42 U.S.C. § 7401 et seq., at two of PSI's facilities. The appellant contends that the warrants were issued without probable cause and that the inspections authorized thereby were excessively broad. After a hearing, the District Court granted summary judgment for the defendants. PSI then filed this appeal.

On March 6, 1979, an authorized inspector for the EPA requested permission to inspect PSI's facility in Gibson County, Indiana (hereafter "the Gibson Station"). The inspector was denied admittance because he refused to sign a "Visitor's Admission Agreement" which contained a waiver of liability provision. On May 17, 1979, two EPA employees were again denied admission to a PSI facility, the Wabash River Generating Station (hereafter the "Wabash River Station") because they declined to sign a similar "Visitor's Admission Agreement."

Subsequently, the EPA applied to United States Magistrate J. Patrick Endsley for the issuance of warrants authorizing the inspection of those facilities. The application for the Wabash River Station was supported, inter alia, by the affidavit of David Schulz, an EPA inspector, in which he stated that stack tests and other monitoring data indicated possible violations of the Indiana State Implementation Plan, i.e. emissions in excess of the particulate emissions limitation. (Regulation APC–4R) and the opacity limitation (Regulation APC–3). In support of the warrant for the Gibson Station, the EPA also submitted an affidavit of David Schulz which stated that certain monitoring data indicated possible violations of Regulation APC–3. Magistrate Endsley issued the two warrants on January 7, 1980 and they were executed on the following two days.

After the inspections, PSI moved to quash the warrants but those motions were denied by Magistrate Endsley on April 1, 1980. This action was then filed in District Court seeking declaratory and injunctive relief. PSI sought a declaratory judgment determining that:

(1) Indiana's Regulation APC–3 is not enforceable; (2) there was no probable cause for issuance of the warrants (because APC–3 is not federally enforceable); (3) the warrants authorized overly broad inspections; and (4) the warrants did not authorize the seizure or demand of documents stored at locations other than those specifically authorized for inspection.[1] PSI also requested injunctive relief preventing future inspections and enforcement actions resulting from information obtained pursuant to those warrants. As noted previously, the District Judge denied all the relief requested.

LEGAL BACKGROUND

Prior to addressing the issues on appeal, a summary of the legal background of this case is necessary.

The Clean Air Act, 42 U.S.C. § 7401, et seq. (hereafter "The Act") authorizes the EPA to promulgate national primary and secondary ambient air quality standards designed to protect the public health and welfare, 42 U.S.C. § 7409(a)(1). However, the primary responsibility for the promulgation of regulations to implement, maintain and enforce these standards is given to the states, 42 U.S.C. § 7401(a)(3). The Act directs each state to submit to the EPA a State Implementation Plan (hereafter "SIP"), 42 U.S.C. § 7410(a)(1), which the Administrator must approve if the plan satisfies the criteria specified in 42 U.S.C. § 7410(a)(2)(A)–(K), 42 U.S.C. § 7410(a)(2). The agency is authorized to promulgate additional or substitute provisions for a state's SIP if a satisfactory plan is not submitted, 42 U.S.C. § 7410(c)(1). The Act contemplates that the states will periodically revise their SIPs, see, inter alia, 42 U.S.C. § 7410(a)(2)(H), and any such revisions

---

1. The latter issue has not been raised on appeal.

must be submitted to the Administrator for approval based on the criteria of 42 U.S.C. § 7410(a)(2)(A)–(K), 42 U.S.C. § 7410(a)(3)(A).

The specific standards used to determine whether a SIP or its revisions conform to the requirements of 42 U.S.C. § 7410(a)(2)(A)–(K) are contained in the agency's regulations, see 40 C.F.R. Part 51. The Administrator's approval actions on each state's SIP and its revisions are published in the Federal Register and are contemporaneously codified and incorporated into the agency's regulations, see 40 C.F.R. Part 52.

Pursuant to the statutory scheme, Indiana submitted its SIP to the EPA for approval in January of 1972. The Plan included, *inter alia*, a provision limiting the emission of particulate matter, labelled APC–4,[2] and a provision relating to opacity limitations, labelled APC–3. These regulations were approved by the EPA (with some minor modifications to APC–4 not relevant here) and thus became part of the federally enforceable SIP. In 1974, Indiana submitted to the EPA new and revised regulations, including a revision of APC–3.[3] Like its predecessor, the new version of APC–3 (hereafter the "1974 APC–3") mandated a maximum opacity limitation of 40% (Ringelmann No. 2). However, it included a new provision which permitted a fifteen minute exemption from that requirement for each 24-hour period.

The EPA published a notice summarizing the proposed regulations and soliciting comments, 40 Fed.Reg. 19210–19211 (May 2, 1975). Subsequently, the EPA published an order (hereafter the "October 1975 order")

consisting of "final agency action" on six of the regulations, including the 1974 APC–3, 40 Fed.Reg. 50032–50033 (October 28, 1975).[4] While it is undisputed that the Administrator disapproved the 15 minute exemption, the approval status of the remainder of the regulation is the subject of controversy.

The EPA contends that it approved the 1974 APC–3 with the exception of the 15 minute limitation and that therefore the regulation is federally enforceable to that extent.[5] PSI contends that the 1975 order disapproved the 1974 APC–3 in its entirety. Appellant presents three arguments in support of its position: (1) that this court determined in *Bethlehem Steel Corp. v. EPA*, 638 F.2d 994 (7th Cir. 1980) that the EPA had not partially approved the 1974 APC–3 and therefore the agency is collaterally estopped from relitigating that issue; (2) that the EPA lacks the power to partially approve revisions to a state's SIP and thus the EPA's order cannot be so construed; and (3) that the language of the 1975 order can only be interpreted to effectuate a complete disapproval of that regulation. We shall address these issues *seriatim*.

*COLLATERAL ESTOPPEL*

■ PSI contends that the EPA is collaterally estopped from asserting that it partially approved the 1974 APC–3 because this Court held to the contrary on that identical issue in *Bethlehem Steel, supra*. It is, of course, settled law that for collateral estoppel to apply the issue must have been actually litigated in the prior suit, the court must have resolved the issue, and that resolution must have been necessary to the judgment, *Continental Can Co. v. Marshall*,

---

2. APC–4 was subsequently redesignated by the state as APC–4R.

3. The entire revised APC–3 is reproduced in Appendix A.

4. This order is reproduced in Appendix B.

5. The EPA also contends that we need not reach the issue of the federal enforceability of the 1974 APC–3. The agency notes that the application for the Wabash River Station alleged violations of APC–4R which is indisputably federally enforceable, see ft. 3 *supra*. As

to the Gibson Station, the EPA argues that since, under the Indiana SIP, violations of APC–3 constitute *prima facie* evidence of violations of APC–4R, see APC–3(3), the application for the warrant alleged sufficient probable cause of a violation of APC–4R (although that regulation was never mentioned therein). However, PSI sought a declaratory judgment determining that APC–3 is not federally enforceable, see pp. 628–629 *supra*, and therefore we cannot avoid that issue.

603 F.2d 590 (7th Cir. 1979) (and cases cited therein).

In *Bethlehem Steel*, this Court reviewed an EPA order which had disapproved the issuance of a Delayed Compliance Order (DCO)[6] to Bethlehem Steel by the Indiana Air Pollution Control Board. Bethlehem Steel had initiated the action pursuant to 42 U.S.C. § 7413(d)(2) contesting the EPA's action. In a thorough opinion, this Court rejected the six reasons relied on by the agency for disapproving the DCO and vacated the order.

One of the alleged deficiencies noted by the EPA in disapproving the DCO was that the state had relied on a regulation that the EPA had partially disapproved. That is, the DCO cited Regulation APC–3 and the EPA concluded that this referred to the 1974 APC–3 which incorporated the disapproved 15 minute exemption. The EPA reasoned that it could not approve the DCO because it was not authorized by 42 U.S.C. § 7413(d)(1) to approve compliance with a requirement less stringent than the applicable SIP.

Bethlehem Steel argued that the EPA lacked the power to partially approve a state's SIP revisions and therefore the agency's action of the 1974 APC–3 must be treated as a complete disapproval of it. Consequently, Bethlehem Steel contended, the original APC–3 was a part of the applicable SIP and was the only enforceable version of that regulation. Under this reasoning, the EPA's approval of the DCO was not prohibited by 42 U.S.C. § 7413(d)(1).

The Court did not accept either party's position, stating:

"... even if we were to agree that the Administrator indeed has the authority to approve revisions partially, the record utterly fails to support that he in fact did so in this case. Furthermore, even if it had been established that he did so, the record fails to establish that the state did in fact apply the wrong APC–3 in the DCO. 638 F.2d at 1007.

While the DCO in issue did not specify which APC–3 the state applied, the Court determined that the circumstances strongly indicated that it was the 1974 version. However, the Court found no evidence that the 15 minute exemption was relied on by the state in reaching its decision. Additionally, it noted that the EPA's conclusion as to which APC–3 had been applied was inconsistent with a previous order of the agency which approved a different Indiana DCO that relied on APC–3, see 44 Fed.Reg. 15493–94 (March 14, 1979). The Court concluded its discussion of the issue in the following paragraph:

In short, the record is inadequate to allow this court effectively to review the Administrator's action. Without any input from the state Board, we are totally uninformed as to which APC–3 the state intended to apply to Bethlehem, or whether the APC–3 applied incorporated the 15-minute exemption. It would seem the state intended to apply the APC–3 the Administrator wishes enforced, yet he had baldly concluded otherwise. Without some support in the record, we cannot accept this as an adequate basis for the Administrator's decision. 638 F.2d at 1008.

Analyzing *Bethlehem Steel* in light of the requirements of *Continental Can*, it is evident that collateral estoppel does not apply to this case. The court's rejection of the EPA's position was based on the inadequacy of the record in supporting the agency's contention that the wrong APC–3 was applied by the state in the DCO. Additionally, the fact that the EPA had recently approved a different Indiana DCO which similarly relied on APC–3 suggested arbitrary action by the agency. It does not appear from the language of the opinion that the Court intended to conclusively resolve the question of the approval status of the 1974 APC–3.

---

**6.** A delayed compliance order is essentially an extension of time granted to a specific stationary pollution source to permit it to comply with certain national ambient air quality standards, see 42 U.S.C. § 7413(d)(1).

However, even assuming that the court in *Bethlehem Steel* determined that the agency had disapproved the entire 1974 APC–3 that finding would have been unnecessary to the judgment in the case. The EPA's position was based on two contested factual premises: (1) that Indiana had applied the 1974 APC–3 with the 15 minute exemption in the DCO; and (2) that the 1974 APC–3 had been partially approved (with the 15 minute exemption being disapproved) and therefore was part of the Indiana SIP. Once the Court determined that the first premise was not supported by the record the agency's position could not be accepted. Since the Court had already rejected the agency's five other reasons for disapproving the DCO, the elimination of this final rationale provided the basis for vacating the

EPA's order. Thus, the Court's resolution of the second factual premise, i.e. the approval status of the 1974 APC–3, would not have affected the relief granted and therefore would not have been necessary to the judgment in the case.[7] Accordingly, even assuming that there was a resolution of the issue in *Bethlehem Steel*, we conclude that the EPA is not collaterally estopped from asserting herein that the 1974 APC–3 was partially approved.[8]

## THE EPA'S AUTHORITY TO APPROVE REVISIONS

■ Prior to determining whether, in fact, the EPA partially approved the 1974 APC–3, it must be determined whether the agency has the power to partially approve a state's revision of its SIP. The agency's

7. We note that neither party addressed the necessity requirement of collateral estoppel in the context of this case. However, subsequent to oral argument, appellant submitted as "additional authority" a copy of the petition filed in *Bethlehem Steel*. In the accompanying letter, counsel for the appellant stated:

> "At oral argument Judge Campbell appeared unaware that the case of *Bethlehem Steel Corp. v. E. P. A.* [citation omitted] arose pursuant to Bethlehem's specific petition for review of any order of appellee EPA's promulgating a more stringent opacity limitation than Indiana Regulation APC–3."

This submission was unnecessary since the Court had taken judicial notice of the record in that case pursuant to the parties' request (PSI brief p. 21 ft. 12, EPA brief p. 34 ft. 22). Thus, the Court was aware of the contents of the petition in *Bethlehem Steel*. The Court admits, however, that it is unaware of the relevance of appellant's submission. The accompanying letter provides no explanation; but we presume appellant is attempting to show that the EPA's partial approval of the 1974 APC–3 was directly put in issue in *Bethlehem Steel* and therefore was necessarily decided. However, this contention is without merit. Paragraph 1 of the petition in *Bethlehem Steel* requested the Court to review the EPA's order disapproving the state's DCO. Paragraph 2 stated:

> "The Order referred to in paragraph 1 of this Petition disapproves a State-issued delayed compliance order and states as one basis for disapproval the following:
> '(6) In addition, visible emissions Regulation APC–3 cited in the State Order is not the APC–3 which constitutes a part of the applicable State Implementation Plan (SIP).'
> Petitioner accordingly petitions this Court to review, in addition to the Order referred to in paragraph 1 hereof any order of the Adminis-

trator promulgating for the Indiana State Implementation Plan a visible emission regulation different from APC–3 referred to in the State Order and disapproved by the Administrator at 40 C.F.R. § 52.776(c) and § 52.-792(a) (40 Fed.Reg. 50033, Oct. 28, 1975). Petitioner is unable to make any more definitive designation of such an order because it has been unable to discover any record of such action or any publication containing the text *of the federally promulgated replacement regulation referred to in the quotation above.*" (emphasis supplied)

It is difficult to see how the above request could have put in issue the partial approval of the 1974 APC–3 since by its own language it assumes that the 1974 APC–3 was disapproved in its entirety. Additionally, it is undisputed that the EPA did not promulgate any additional visible limitations regulations for the Indiana Plan. In fact, appellant argues that the omission rendered ineffective the EPA's partial approval, see pp. 633–634 *infra*. Thus what was sought to be reviewed by the above request did not in fact exist. The Court in *Bethlehem Steel* was apparently aware of this fact since the opening paragraph of the opinion clearly states that the only matter under review was the EPA's disapproval of the state's DCO. Therefore, this "additional authority" has no bearing on the issues in this case.

8. We note that in a recent case, *United States v. Bethlehem Steel Corporation*, Civil No. H–78–491 (N.D.Ind., February 12, 1982), the Court concluded that *Bethlehem Steel* did not conclusively establish the unenforceability of APC–3 and chose instead to rely on the lower court decision in the instant case.

authority is addressed in 42 U.S.C. § 7410(a)(3)(A) which provides:

The Administrator shall approve any revision of an implementation plan applicable to an air quality control region if he determines that it meets the requirements of paragraph (2) [42 U.S.C. § 7410(a)(2)] and has been adopted by the State after reasonable notice and public hearings.

Appellant argues that the Administrator is not empowered to partially approve a regulation because that would permit him to approve something never actually adopted by the state and would permit him to circumvent the promulgation procedures required by 42 U.S.C. § 7410(c). The EPA contends that its power to approve revisions to a SIP is equivalent to its power to approve the original SIP. Since under 42 U.S.C. § 7410(a)(2) the agency has the authority to approve a plan "or any portion thereof," the EPA's position is that it may approve any portion of a state submitted revision, see 40 C.F.R. § 51.8.

Initially, we note that considerable deference is to be accorded an administrative agency's construction of an Act it is charged with enforcing, *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). This principle has been recently applied to the EPA's interpretation of the Clean Air Act, *Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975); *Union Electric Co. v. E. P. A.*, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976).

The major issue in *Train* was whether a state variance applicable to an individual pollution source could be approved by the EPA as a "revision" under 42 U.S.C. § 7410(a)(3) or only as a "postponement" under 42 U.S.C. § 7410(f). The EPA had argued that § 7410(a)(3) was appropriate, but the Fifth Circuit had concluded that § 7410(f) was the only permissible means for approving such a variance. That decision limited the agency's power significantly since the requirements of 42 U.S.C. § 7410(f) were more stringent, both procedurally and substantively, than those of 42

U.S.C. § 7410(a)(3). The Supreme Court reversed the Fifth Circuit's decision, stating:

"Without going so far as to hold that the Agency's construction of the Act was the only one it permissibly could have adopted, we conclude that it was at the very least sufficiently reasonable it should have been accepted by the reviewing courts." 421 U.S. at 75, 95 S.Ct. at 1479–80.

Similarly, we find that the agency's interpretation in this case is sufficiently reasonable that we should accept it. The function of the Administrator's approval power over the original SIPs and their revisions is identical: to ensure that the state's SIPs comply with the minimum requirements of 42 U.S.C. § 7410(a)(2)(A)–(K). The subsections governing the exercise of these powers are essentially identical, the only major distinction being that 42 U.S.C. § 7410(a)(2) permits approval of the SIP "or any portion thereof" while 42 U.S.C. § 7410(a)(3) permits approvals of "revisions." The meaning of the term "revision" in this subsection was addressed in *Train*. The Court did not provide a specific definition but stated that

"In the implementation plan context, normal usage would suggest that ... a revision is a change in the plan itself which deletes or modifies [a] requirement." 421 U.S. at 89, 95 S.Ct. at 1486–87.

Applying that usage, 42 U.S.C. § 7410(a)(3) empowers the Administrator to approve any change in a SIP, i.e., any provision which differs, in substance or effect, from the original SIP. This interpretation is reasonable in light of the purpose of the approval process, i.e., to ensure that the current SIP complies with the requirements of 42 U.S.C. § 7410(a)(2)(A)–(K).

To limit the Administrator to approving or disapproving each entire revised regulation in a SIP would elevate form over substance and would be inconsistent with the policy underlying the approval process. Congress intended each state to be given wide discretion in formulating its SIP, with the only limitation being that each plan must comply with the criteria listed in 42

U.S.C. § 7410(a)(2)(A)–(K), see *Train*, 421 U.S. 62, 79, 95 S.Ct. 1473, 1481; *Union Electric*, 427 U.S. 248, 250, 96 S.Ct. 2521, 2522; *Bethlehem Steel*, 638 F.2d 994, 996–997. To that end, Congress limited the agency's power to disapprove each state's submissions:

> "[§ 7410(a)(3)] requires the Agency to approve "any revision" which is consistent with [§ 7410(a)(2)'s] minimum standards for an initial plan, and which the State adopted after reasonable public notice and hearing; no other restrictions whatsoever are placed on the Agency's duty to approve revisions." *Train*, 421 U.S. at 98, 95 S.Ct. at 1491.

To require the Administrator to disapprove an entire regulation because one provision in it is inconsistent with the requirements of 42 U.S.C. § 7410(a)(2) would unnecessarily curtail the discretion of the states in formulating their SIPs. Additionally, such a construction would require the agency to disapprove portions of a state's plan that comply with 42 U.S.C. § 7410(a)(2). Thus, we find the agency's construction of 42 U.S.C. § 7410(a)(3) to be reasonable in light of the language and purpose of that statute.

PSI's arguments to the contrary are unpersuasive. Appellant contends that to permit the Administrator to approve a portion of a revised regulation would allow him to approve something not actually adopted by the state as required by 42 U.S.C. § 7410(a)(3)(A), citing *Citizens For A Better Environment v. EPA*, 649 F.2d 522 (7th Cir. 1981); *Illinois v. Celotex Corporation*, 516 F.Supp. 716 (C.D.Ill.1981); *Sierra Club v. Indiana and Michigan Electric Comp.*, No. NA 81–8C (S.D.Ind. June 5, 1981); *Sierra Club v. Indiana-Kentucky Electric Corp.*, No. NA 81–7–C (S.D.Ind. May 11, 1981). However, approval of *any portion of the original SIP* is clearly permitted by 42 U.S.C. § 7410(a)(2) even though that subsection also limits the Administrator to ap-

proving that which was adopted by the state. Appellant has provided no reason why regulations should be severable for approval purposes when submitted as part of the original SIP but not when they are submitted as revisions to the SIP.[9] The cases cited by appellant are inapposite. Those cases simply hold that the EPA cannot approve state regulations which were improperly promulgated by the state and therefore invalid when submitted to the agency. We do not construe the adoption requirement to prevent the EPA from approving only those portions of revisions to a SIP that comply with the criteria of 42 U.S.C. § 7410(a)(2)(A)–(K).

PSI also argues that partial approval of a revision is not permissible because it would enable the Administrator to circumvent the promulgation procedures mandated by 42 U.S.C. § 7410(c). In support of this contention the appellant quotes *District of Columbia v. Train*, 521 F.2d 971 (D.C.Cir.1975), *vacated*, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977);

> "[§ 7410(c)] is in fact the [EPA's] only recourse when [it] disapproves a state submitted plan in whole or in part ..." 521 F.2d at 983–984.

However, the rest of that sentence reads: "or if the state fails to submit a plan, *since the Act contains no enforcement mechanisms which could be used to force a reluctant state to adopt and submit an adequate plan under section 110(a)*." Id. (emphasis supplied)

This language is particularly significant in view of the facts of that case. In *District of Columbia v. Train*, the EPA had disapproved certain portions of the transportation control plans submitted by Maryland, Virginia, and the District of Columbia. The agency then promulgated proposed regulations which included provisions ordering those states to submit additional regulations. The court vacated those portions of the agency's order, stating:

---

9. In the absence of a compelling argument to the contrary, we must presume that the adoption requirement has the same meaning in subsection (a)(3) as in subsection (a)(2), *Lewellyn v. Harbison*, 31 F.2d 740, 742 (3rd Cir.

1929); *United States v. Montgomery Ward*, 150 F.2d 369, 376–377 (7th Cir. 1945), vacated as moot, 326 U.S. 690, 66 S.Ct. 140, 90 L.Ed. 406 (1945); *Gregg v. Manno*, 667 F.2d 1116, 1117 (4th Cir. 1981).

"By ordering the states to enact and submit regulations after their initial plans were found to be inadequate, rather than promulgating his own regulations directly controlling sources of air pollution, the Administrator has thus exceeded the authority conferred upon him by section 110(c) of the Clean Air Act." 521 F.2d at 986.

Thus the holding in *District of Columbia v. Train* was that the agency is not authorized to require the states to submit an adequate SIP or additional provisions thereto.[10]

There is no indication that the holding in *District of Columbia v. Train* was intended to relate to a situation in which a particular provision in a SIP (or a revision to it) does not satisfy the requirements of 42 U.S.C. § 7410(c)(2)(A)–(K) and a satisfactory substitute cannot be promulgated or would be superfluous.[11] Apparently in this situation, the appellant would have the agency either repromulgate (with appropriate hearings, etc. see 42 U.S.C. § 7410(c)) the state's submission with the disapproved portions excised, or draft and promulgate an entirely different but satisfactory regulation. The former alternative would be unnecessarily duplicitous and should not be mandated in the absence of specific legislation requiring it; the latter method would be similarly duplicitous and would be inconsistent with the congressional policy underlying the approval process, see pp. 632–633 *supra.*

In summary, we find that the agency's interpretation of 42 U.S.C. § 7410(a)(3) is quite reasonable and will be adopted by this court. Appellant's arguments to the contrary are unpersuasive.[12] It has demonstrated no compelling reason for construing the Administrator's power to approve revisions as different from his power to approve the original SIP. Since the latter power clearly includes the authority to approve any portion of the SIP, and such a construction does not do violence to the language of the statute relating to SIP revisions, we shall adopt the agency's construction.

## APPROVAL STATUS OF THE 1974 APC–3

Having determined that the EPA had the authority to partially approve a revised regulation in a SIP, we must determine whether, in fact, the agency exercised that power as to the 1974 APC–3. The District Judge analyzed the language in the 1975 order and determined that the Administrator had disapproved the 15 minute exemption in the 1974 APC–3 but had otherwise approved the revised regulation. PSI contends that the District Court's factual finding was clearly erroneous[13] because the agency's or-

**10.** This is settled law, *Plan for Arcadia v. Anita Associates*, 379 F.Supp. 311, aff'd 501 F.2d 390 (9th Cir. 1974); *Brown v. EPA*, 521 F.2d 827 (9th Cir. 1975); *Friends of the Earth v. Carey*, 422 F.Supp. 638 (S.D.N.Y.1976), see also *Illinois v. E. P. A.*, 621 F.2d 259, 261 (7th Cir. 1980).

**11.** This type of situation occurred in *Big Rivers Electric Corp. v. EPA*, 523 F.2d 16 (6th Cir. 1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976), and the Court upheld the Administrator's disapproval of the provision without requiring any promulgation pursuant to 42 U.S.C. 7410(c), see p. 637 *infra.* However, we note that there was no specific discussion in that opinion of the adoption requirement.

**12.** Appellant presents a parade of administrative "horribles" that could occur if partial approval is permitted, e.g., such regulations could not be challenged in state courts on grounds of infeasibility nor could they be the subject of a state variance. This presentation ignores the fact that all of these alleged "horribles" can occur as a result of the Administrator's authority to partially approve the original SIP. More importantly, as noted in *Train*, this type of argument "goes more to the wisdom of what Congress has chosen to do than to determining what Congress has done," 421 U.S. at 92, 95 S.Ct. at 1488. Additionally, if the specific exercise of the partial approval power results in a deprivation of judicially cognizable rights, such action could be challenged in a petition brought pursuant to 42 U.S.C. § 7607(b)(1).

**13.** Appellant notes that when:

"the factual determination is primarily a matter of drawing inferences from undisputed facts or determining their legal implications, appellate review is far broader than where disputed evidence and questions of credibility are involved," *Yorke v. Thomas Iseri Produce Co.*, 418 F.2d 811, 814 (7th Cir. 1969).

We agree that this broader standard of review is appropriate in this case.

der was ambiguous and never actually stated that any part of the 1974 APC–3 was approved.

The EPA's order is reproduced in Appendix B. The agency stated therein that the order consisted of the agency's final action on six submitted regulations and it discussed each of those submissions at some length. In addressing the 1974 APC–3, the Administrator noted that the 15 minute exemption was the most significant deviation from the original APC–3 and that, based on industry comments and other provisions in Indiana's SIP, the exemption was superfluous. Additionally, the Administrator determined that the exemption could interfere with the attainment and maintenance of particulate standards and noted that the state had not demonstrated to the contrary as required by 40 C.F.R. § 51.13(e)(1). The order then stated:

> Accordingly, APC–3 must be disapproved to the extent that the 15 minute exemption provision in section 1 fails to meet the requirements of § 51.13(e)(1) and 51.-19(c).

The Administrator then noted that any exemptions granted pursuant to section 2(c) would have to be considered on a case by case basis and that administrative rulings clarifying certain terms in the regulation might require approval by the EPA prior to being effective. The penultimate paragraph of the order stated:

> "With the exception of the above-noted disapproval actions and material returned to the State or held in abeyance pending further review, the proposed revisions meet the substantive and procedural requirements of Section 110 of the Clean Air Act and 40 C.F.R. Part 51 and are hereby approved as revisions to the Indiana Implementation Plan, effective immediately."

Thus it appears clear that, with the exception of the disapproval action with respect to the 15 minute exemption, the Adminis-

trator approved the 1974 APC–3. PSI contends that the agency cannot be deemed to have approved any part of the 1974 APC–3 because that term was not actually used in the paragraphs which specifically addressed that regulation. However, appellant cites no authority to support the proposition that approvals must be stated in such a form in order to be effective. Additionally, in his discussion of the 1974 APC–3 the Administrator noted that exemptions granted under 2(c) of that regulation would require individual approval as might administrative rulings clarifying certain terms in the regulation. These comments would obviously be unnecessary if the entire regulation was being disapproved.

The appellant's vagueness argument is further weakened by the regulations which the agency promulgated contemporaneously with the October 1975 order. These regulations were published in the Federal Register with the order and serve to codify the Administrator's actions. The two regulations relevant to this discussion, 40 C.F.R. § 52.776(c) and § 52.792(a) [14] became part of the regulations reflecting the approval status of the Indiana SIP. That set of regulations is prefaced by § 52.773 which states:

> "With the exceptions set forth in this subpart, the Administrator approves Indiana's plan for attainment and maintenance of the national standards."

Sections 52.776 and 52.792 address the status of the 1974 APC–3:

> § 52.776 Control Strategy. Particulate Matter.
>
> (c) APC–3 of Indiana's Air Pollution Control Regulations (visible emissions limitation) is disapproved insofar as the phrase "for more than a cumulative total of 15 minutes in a 24-hour period" will interfere with attainment and maintenance of particulate standards.[15]

\*    \*    \*    \*    \*    \*

14. This regulation was subsequently redesignated § 52.794(a), see 41 Fed.Reg. 3475 (Jan. 23, 1976).

15. PSI suggests that this regulation is ambiguous because "insofar as" is synonymous with

§ 52.792 Source Surveillance.

"The requirements of 51.19(c) of this chapter are not met by the phrase 'for more than a cumulative total of 15 minutes in a 24-hour period' contained in Section 1 of APC–3 of the Indiana Air Pollution Control Regulations."

These regulations, considered in the context of their promulgation, unambiguously describe the Administrator's approval of the 1974 APC–3. Reading these regulations in conjunction with the October 1975 order, we are compelled to reach the same conclusion as the District Judge: the EPA partially approved the 1974 APC–3, disapproving only the 15 minute exemption. Accordingly, even under the liberal standard of review appropriate to this case, see ft. 13 *supra,* we will not disturb the factual findings of the District Court.

"because," citing Webster's New International Dictionary 1255 (2d ed. 1949); American Heritage Dictionary 663 (1971). Thus appellant argues that this regulation supports its position that the Administrator disapproved the 1974 APC–3 in its entirety because the 15-minute exemption was unacceptable. However, the primary definition of "insofar as" is "to such extent or degree" Webster's New International Dictionary p. 1286 (2d ed. 1959); Funk & Wagnall's Standard College Dictionary p. 669 (1963); Thorndike-Barnhardt Dictionary p. 1019 (1963); American Heritage Dictionary of the English Language (1969). Additionally, in the body of the 1975 order the Administrator stated that "APC–3 must be disapproved to the extent that the 15-minute exemption failed to meet the requirements of § 51.13(e)(1) [which codifies control strategy requirements] and 51.-19(c)." In this context, the interchanging of these synonymous adverbial phrases does not support a finding of ambiguity.

16. For example, PSI argues that the 15-minute exemption was an "integral part" of Indiana APC–3 and therefore there was not the proper subject matter for a partial disapproval, citing *City of Highland Park v. Train,* 519 F.2d 681, 689 (7th Cir. 1975). PSI also argues that, contrary to the conclusion in the October 1975 order, the 15-minute exemption was not superfluous. Additionally, appellant argues that it has been denied an opportunity to challenge the technical feasibility of the 1974 APC–3 as approved. We note that technical feasibility is not an issue for the EPA to consider when it evaluates a state submitted SIP; *Union Electric, supra;* and probably is not relevant when it promulgates provisions for a SIP, see *Cleveland Electric Illuminating Co. v. E. P. A.,* 572 F.2d 1150, 1164 (6th Cir. 1978). In any event, technical

*OTHER ARGUMENTS*

PSI presents certain arguments that relate to specific issues involved in the EPA's analysis of the 1974 APC–3 and its disapproval of the 15 minute exemption.[16] The EPA contends that appellant cannot attack the merits of the October 1975 order because the only means of obtaining such review would have been through a petition filed in the appropriate Court of Appeals within thirty days of the agency's action,[17] 42 U.S.C. § 1857h–5(b)(1) (1970).[18] The failure of the appellant to file a timely petition in the proper forum deprives this court of jurisdiction over those issues, *Granite City Steel Comp. v. E. P. A.,* 501 F.2d 925 (7th Cir. 1974); *Getty Oil Comp. v. Ruckelshaus,* 467 F.2d 349 (3rd Cir. 1972); *Oljato Chapter of Navajo Tribe v. Train,*

feasibility is relevant to the fashioning of a compliance order under 42 U.S.C. § 7413(a)(4), see *Union Electric,* 427 U.S. at 268, 96 S.Ct. at 2530; and may be relevant in enforcement proceedings, see *Buckeye Power, Inc. v. E. P. A.,* 481 F.2d 162, 173 (6th Cir. 1973); *Indiana & Michigan Electric Co. v. EPA,* 509 F.2d 839, 847 (7th Cir. 1975); see also *Union Electric,* 427 U.S. at 268 ft. 18, 96 S.Ct. at 2530–31 ft. 18.

17. The EPA also raises this argument in response to appellant's contentions that the agency lacks the power to partially approve revisions and that the language of the October 1975 order should not be construed as a partial approval of the 1974 APC–3. However, we do not believe that all issues regarding the October 1975 order are beyond scrutiny. PSI's argument as to the proper interpretation of the agency's action is not barred since it merely raises a factual issue as to the operative effect of that order. In other words, the issue is not why the EPA did what it did, but what did the EPA, in fact, do. In this regard, the general issue of the Administrator's power to partially approve a revision has to be resolved in order for the Court to determine whether the order can be validly construed as an exercise of such a power. However, as we conclude in this section of the opinion, issues relating to the Administrator's rationale for partially approving the 1974 APC–3 are not properly before the Court.

18. In the 1977 amendments to the Clean Air Act, this time period was extended to sixty days and the statute was redesignated, see 42 U.S.C. § 7607(b)(1). See also ft. 19.

515 F.2d 654 (D.C.Cir.1975); *Lloyd A. Fry Roofing Co. v. E. P. A.*, 554 F.2d 885 (8th Cir. 1977). PSI argues, however, that if the 15 minute exemption was validly disapproved then it was precluded from seeking judicial review of that action, thus raising the specter of a due process violation. In support of this contention, appellant relies on the language of the applicable review statute, 42 U.S.C. § 1857h–5(b)(1) (1970),[19] and *Utah International, Inc. v. E. P. A.*, 478 F.2d 126 (10th Cir. 1973). We conclude that *Utah International* is distinguishable and that appellant was not denied an opportunity for judicial review of the agency's action.

In *Utah International*, the EPA had issued an order partially approving the New Mexico SIP. Subsequently, the agency issued another order disapproving a part of the implementation plan and proposing new regulations to replace those provisions. Utah International, Inc. sought review of the latter order and the court determined that it lacked jurisdiction under 42 U.S.C. § 1857h–5(b)(1):

> The statute providing for judicial review of orders of the EPA relating to implementation plans is obviously designed to provide for judicial review of final administrative action. Hence, an order approving a state plan is subject to review, for by approving a state plan the EPA thereby places the state plan into effect . . . Accordingly, in the instant case until such time as the EPA promulgates its own plan . . . there is no final and applicable order under the statute. It is on this basis that we conclude that the present petition to review is not permitted by 42 U.S.C. § 1857h–5(b)(1) and that we are without jurisdiction. 478 F.2d at 127–128.

In the instant case, however, the agency's October 1975 order was clearly a final administrative action. The order stated it was "the final agency action on APC–3 [and five other regulations] . . ." and it is evident from the last paragraph that it operated to put in effect certain new and revised regulations of the Indiana SIP. Thus, the holding in *Utah International* does not apply to this case.

Appellant's argument is without merit for another reason. The potential injury to PSI arising out of the October 1975 order did not result from the disapproval of the 15 minute exemption, but from the approval *and concomitant enforceability* of APC–3 with that exemption excised. Thus if appellant wanted to seek review of the October 1975 order it should have filed a petition contesting the Administrator's approval action, as specifically authorized by 42 U.S.C. § 1857h–5(b)(1) (1970).

This type of petition for review was filed and heard in *Big Rivers Electric Corp. v. E. P. A.*, 523 F.2d 16 (6th Cir. 1975), *cert. den.* 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976).[20] In that case, the EPA issued an order approving the Kentucky SIP with the exception of one provision which was specifically disapproved. The Tennessee Valley Authority and several electrical utilities companies sought review of that order claiming that the agency's disapproval action was not authorized and, alternatively, that it was an abuse of discretion. The petitioners did not raise any issue as to the approval portions of the EPA's order. The court raised, *sua sponte*, the issue of its jurisdiction to review a disapproval action under 42 U.S.C. § 1857h–5(b)(1) (1970):

> There is no statutory provision for review of an action disapproving a plan or a portion thereof because disapproval is not

19. That statute provided that a

"... petition for review of the Administrator's action in approving or promulgating any implementation plan ... may be filed only in the United States Court of Appeals for the appropriate circuit ... within 30 days from the date of such promulgation or approval ..."

The scope of judicial review was extended in 1977 to include "any other final action of the

Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I [relating, *inter alia*, to approval actions on SIPs] of this chapter) ..." 42 U.S.C. § 7607(b)(1).

20. We note that the Court of Appeals' decision in Big Rivers was rendered prior to the October 1975 order in issue herein.

a final administrative action [citing *Utah International*]. However, all parties including the Administrator have treated his action as a final approval of the Kentucky Plan with the disapproved portion eliminated, and we treat the proceedings as a petition for review of the approval of the Plan. 523 F.2d at p. 18.

Thus, we conclude that PSI could have filed a petition for review of the October 1975 order under 42 U.S.C. § 1857h–5(b)(1) (1970).[21] In the context of that appeal, appellant could have addressed any issue arising out of the disapproval of the 15 minute exemption. Therefore, having dispersed the specter of a due process violation, we must reiterate that we lack jurisdiction to entertain appellant's attack on the merits of the October 1975 order.

*CONCLUSION*

■ Accordingly, we conclude that the 1974 APC–3 is federally enforceable with the 15-minute exemption excised. Therefore, the applications for the inspection warrants presented sufficient probable cause of violations of the federally enforceable Indiana SIP to justify their issuance to the EPA. PSI's arguments that the inspections, as authorized and executed, were overly broad were thoroughly analyzed and properly rejected by the District Judge, and we hereby adopt that portion of his opinion, 509 F.Supp. 720, 724–726.

Accordingly, the judgment of the District Court is affirmed.

APPENDIX A

325 IAC 1–3–1 Limitation on emissions
Authority: IC 13–1–1–4; IC 13–7–5–1
Affected: IC 13–1–1–1; IC 13–1–1–4

Sec. 1. Limitation. No person shall operate any equipment so as to produce, cause, suffer, or allow smoke or other visible emissions in excess of 40 per-cent opacity (Ringelmann No. 2) for more than a cumulative total of fifteen minutes in a 24-hour period except as allowed in Sec. 2

and Sec. 4 [*325 IAC 1–3–2 and 325 IAC 1–3–4*]. Opacity values shall not be considered valid, unless observed and determined by a qualified person. Visible emissions shall exclude uncombined water. (*Air Pollution Control Board: APC 3. Sec 1; filed Oct 7, 1974, 10:55 am: Rules and Regs. 1975, p. 122*)

Cited in: 325 IAC 1–3–2—325 IAC 1–3–4.

325 IAC 1–3–2 Temporary exceptions from compliance
Authority: IC 13–1–1–4; IC 13–7–5–1
Affected: IC 13–1–1–1; IC 13–1–1–4; IC 13–7–10–3

Sec. 2. Temporary Exceptions from Compliance. (a) Fire Starting. When building a new fire in a boiler, smoke no darker than 60 percent opacity may be emitted for a period not to exceed ten minutes on one occasion in any 24-hour period.

(b) Boilers. When cleaning a fire in a boiler or blowing tubes, smoke which is not darker than 60 percent opacity may be emitted for periods not exceeding five minutes in any 60-minute period. Such emissions shall not be permitted on more than six occasions during any 24-hour period.

(c) Other. That the time and opacity limitations set forth in Sec. 1 [*325 IAC 1–3–1*], Sec. 2(a) and Sec. 2(b) [*subsections (a) and (b) of this section*] may be exceeded for reasonable brief periods of time by the specific terms of time and opacity limitations set forth in an operation permit required under APC 19 [*325 IAC 1–16*]. The exception may be granted if:

(i) The exception is requested, and

(ii) it is shown that no alternative control method is available, and

(iii) it is not possible for the applicant to comply with Sec. 1 [*325 IAC 1–3–1*], Sec. 2(a) and Sec. 2(b) [*subsections (a) and (b) of this section*].

Further, that said agency is then authorized to issue an operation permit with said

---

**21.** Additionally, we note that the burden was on the PSI to seek review if it had an objection to the propriety of the EPA's action, *Ohio Envi-* *ronmental Council v. United States District Court*, 565 F.2d 393, 396–397 (6th Cir. 1977), see also *Train*, 421 U.S. at 92, 95 S.Ct. at 1488.

permit setting forth, in detail, the specific terms of the time and opacity limitations granted. (*Air Pollution Control Board; APC 3, Sec 2; filed Oct 7, 1974; 10:55 am: Rules and Regs. 1975, p. 123*)

Cited in: 325 IAC 1–3–1; 325 IAC 1–3–3; 325 IAC 1–3–4.

325 IAC 1–3–3 Evidence of violations; single stacks and multiple stacks

Authority: IC 13–1–1–4; IC 13–7–5–1

Affected: IC 13–1–1–4; IC 13–7–5–1

Sec. 3. Violation of Other Regulations. (a) Single Stacks. A violation of Sec. 1 [*325 IAC 1–3–1*] of this Regulation shall constitute prima-facie evidence of a violation of any applicable particulate emission control regulation of the Board, but may be refuted by a stack emission test conducted in accordance with the Board's Source Sampling Policy, or other evidence acceptable to the Board. No violation shall have occurred if it can be shown the emissions are exempt under Section 2 [*325 IAC 1–3–2*] of this Regulation or due to a malfunction providing the requirements of Section 4 [*325 IAC 1–3–4*] are adhered to.

(b) Multiple Stacks. For facilities with multiple stacks, each stack must comply separately with the opacity limitations of Sec. 1 [*325 IAC 1–3–1*], except as allowed in Sec. 2 [*325 IAC 1–3–2*], even though the multiple stacks, as a group, are in compliance with the limitations of the Board's applicable particulate emission control regulations. (*Air Pollution Control Board; APC 3, Sec. 3; filed Oct 7, 1974, 10:55 am: Rules and Regs. 1975, p. 123*)

325 IAC 1–3–4 Malfunctions

Authority: IC 13–1–1–4; IC 13–7–5–1

Affected: IC 13–1–1–1; IC 13–1–1–4; IC 13–1–1–7

Sec. 4. Malfunctions. (a) Malfunction. For the purpose of this regulation [*325 IAC 1–3*] shall mean any sudden, unforeseen, or unavoidable failure of air pollution control equipment, or combustion or process equipment to operate in a normal manner and in compliance with all applicable regulations of the Board.

(b) Reporting. When a malfunction of any combustion or process operation of air pollution control equipment lasts more than one hour, the Technical Secretary shall be notified by telephone, or telegraph, as soon as practicable, but in no event later than four daytime business hours after the beginning of said occurrence. Information of the scope and expected duration of the malfunction shall be provided. A record shall be kept of all malfunctions, including start ups, or other events which result in violations of Sec. 1 and Sec. 2 [*325 IAC 1–3–1 and 325 IAC 1–3–2*], and such record shall be made available to the Board upon request.

(c) Maintenance. Source operators are responsible for operating and maintaining all equipment and processes in compliance with all applicable regulations of the Board. The Board recognizes that malfunctions may occur for many and varied reasons. Curtailment of operations shall be required, except as covered in Sec. 4(d) [*subsection (d) of this section*], if the source is not in compliance at least 90 percent of the operating time over the most recent 12-month period. Where the record shows repeated malfunctions exceeding 5 percent of the normal operational time attributed to improper maintenance of faulty equipment, the Board may require that the maintenance program be improved or that the defective or faulty equipment be replaced. To eliminate long term malfunction periods resulting from delays in obtaining replacement parts, an adequate stock of replacement parts shall be maintained.

(d) Malfunction Emission Reduction Program. Malfunctions of air pollution control equipment, and combustion and process equipment may result in increased emissions such that the air quality standards may be violated or that health hazards may occur. It is recognized that a variety of steps, including complete shut down of the equipment involved, can be taken to reduce the amount of emissions to a reasonable value. Any source that has an emission rate in excess of 2000 pounds per hour of any pollutant following a malfunction, or because of the health hazard created by a

lesser emission rate than that specified, shall submit a malfunction emission reduction program. Such a malfunction emission reduction program shall be submitted to the Board within 60 days after promulgation of this regulation [*325 IAC 1–3*] for its approval. Documentation shall include, but not be limited to, the normal operating emission rate, the malfunction emission rate, and the program proposed to reduce emissions to a reasonable emission rate. The program shall be based on the best practical estimates of type and number of malfunctions experienced during the past 12 months of normal operation, and the scope and duration of such malfunctions. (*Air Pollution Control Board; APC 3, Sec 4; filed Oct 7, 1974, 10:55 am: Rules and Regs. 1975, p. 123*)

Cited in: 325 IAC 1–3–1; 325 IAC 1–3–3.

325 IAC 1–3–5 Federal new source performance standards
Authority: IC 13–1–1–4; IC 13–7–5–1
Affected: IC 13–1–1–1

Sec. 5. Federal New Source Performance Standards. In addition to the requirements set forth herein, all new sources for which federal standards have been promulgated shall comply with the applicable portions of the Federal New Source Performance Standards 40 CFR Part 60. (*Air Pollution Control Board; APC 3, Sec 5; filed Oct 7, 1974, 10:55 am: Rules and Regs. 1975, p. 124*)

APPENDIX B

Title 40—Protection of the Environment
CHAPTER 1—ENVIRONMENTAL PROTECTION AGENCY

[FRL 446–5]

PART 52—APPROVAL AND PROMULGATION OF STATE IMPLEMENTATION PLANS

Indiana—Approval of Plan Revisions

Pursuant to section 110 of the Clean Air Act, the State of Indiana submitted to the Administrator of the United States Environmental Protection Agency an implementation plan on January 31, 1972 to achieve the National Ambient Air Quality Standards. The plan was approved by the Administrator on May 31, 1972 (37 FR 10842) with several exceptions. Subsequent to the May 31, 1972 action, the State submitted amended sulfur dioxide, hydrocarbon, and carbon monoxide regulations for stationary sources which the Administrator approved on May 14, 1973 (38 FR 12698).

Recently, the Indiana Air Pollution Control Board after public notice and hearing adopted revisions to regulations APC–13, APC–15, APC–16, and APC–17, and adopted new regulations APC–18, APC–20, and APC–22. On March 7, 1974, the Technical Secretary of the Air Pollution Control Board (APCB), acting for the Governor of Indiana, submitted to the Regional Administrator new regulations APC–18 and APC–20. On October 3, 1974 the Technical Secretary submitted revised regulations APC–16, APC–17, and new regulation APC–22. On November 8, 1974, the Technical Secretary submitted revised regulations APC–3 and APC–15, and on December 5, 1974, submitted a revised APC–13. With the revised regulations, the State submitted a technical support document describing the rationale for the changes to the regulations.

On May 2, 1975 the Regional Administrator of the U.S. EPA, Region V, published for public comment these proposed revisions to the regulations contained in the Indiana State Implementation Plan (SIP). The regulatory changes affect the control of five criteria pollutants: total suspended particulates, sulfur dioxide, hydrocarbons, nitrogen oxides, and carbon monoxide. Regulations establishing timetables for particulate control (APC–18) and controlling fugitive dust (APC–20) were included in the notice. Most significant, however, was a regulation (APC–22) which classifies counties within Indiana according to the need for control of emissions from sources located in each county, in fact, a wholesale revision of the applicable control strategy for all pollutants.

In the rulemaking proposal, eleven counties in Indiana were singled out for being

unacceptably classified by APC–22 for purposes of sulfur dioxide controls set forth in APC–13, based on EPA's preliminary review of the State's technical support document. The EPA review of the technical support document supporting the proposed rulemaking indicated that an "A" Classification for those counties might be more appropriate. Public utility companies have submitted air quality, emission and meteorological data to demonstrate that a "C" classification would be appropriate in most counties. As a result of a meeting between EPA and State officials, the State has undertaken a reassessment of the APC–22 classification for the eleven counties based on a Federally approved methodology involving use of computerized dispersion modelling in which sources are examined for their impact on air quality. This work is currently under review in conjunction with other submitted data, by the regional office and final rulemaking action on APC–13 and pertinent portions of APC–22 will take place shortly.

This notice finalizes action on APC–3, APC–16, APC–17, APC–18, APC–20, and APC–22, insofar as it classifies counties for purposes of controlling total suspended particulates, carbon monoxide, and nitrogen dioxide. Final action on APC–13, APC–15, and the APC–22 classification of counties for sulfur dioxide and hydrocarbon control will be forthcoming.

New APC–3, the visible emissions regulation, varies from the approved regulation in several respects, the most significant of which is the introduction of a 15-minute exemption period in each 24-hour period. The power companies submitted comments to the effect that such an exemption is necessary for them when starting fires or cleaning units. Since sections 2(a) and 2(b) of APC–3 already provide an exemption to visible emission requirements for fuel-burning sources in such circumstances, this comment appears to be superfluous. Generally, visible emission regulations correspond to the surveillance requirement set forth at 40 CFR 51.19(c) and section 3 of APC–3 indicates that such was the intent of Indiana. However, certain intermittent sources, such as coke batteries and roof monitors, may cause gross visible emissions and remain within the exempted time limits. For such sources at least, APC–3 would be ineffective and impractical as a surveillance technique if indeed it could be deemed available. Such being the case, it is incumbent upon the State to demonstrate that failure of intermittent sources to comply with APC–3 during the exempted time period would not result in an interference with attainment and maintenance of the standards. [40 CFR 51.13(e)(1)]. The State has failed to present such a demonstration. Accordingly, APC–3 must be disapproved to the extent that the 15-minute exemption provision in section 1 fails to meet the requirements of §§ 51.13(e)(1) and 51.19(c). It should also be noted that EPA will not regard itself as bound by exemptions granted by the Board pursuant to section 2(c). Such exemptions must be considered on a case by case basis for impact on attainment and maintenance of standards.

Other comments from industry and the utilities criticized APC–3 for vagueness and generally conveyed a need for clarification of terms. EPA is concerned about the confusion caused by the regulation but believes most difficulties can be resolved by administrative resolution. Such resolutions to the extent that EPA considers them substantive changes would need to be reviewed by EPA for consistency with the implementation plan before becoming effective.

New APC–16, control of carbon monoxide (CO) emissions from stationary sources, in conjunction with the classification of counties in APC–22 for purposes of CO control, effectively removes all existing stationary sources of CO from the applicable control strategy. A review of the last several years of air quality data showed few violations of the standards. The small number of stationary CO sources in Indiana and the fact that the bulk of CO emissions are mobile source initiated are reasons for EPA's approval of this strategy revision. APC–16 will require control of new stationary CO sources to assist in maintenance of the standards.

642

New APC–17 control of nitrogen dioxide [NO $^2$] emissions from stationary sources, in conjunction with the classification of counties in APC–22 for purposes of NO $^2$ control, effectively removes all stationary sources of NO $^2$ from the applicable control strategy. EPA's reclassification of AQCR's placed all but the Indiana portion of the major metropolitan Chicago AQCR in attainment status (39 FR 16344, May 8, 1974). The available air quality data in the Northwest Indiana Area indicates no standard violations. Accordingly, EPA will approve this strategy revision. APC–17 will require control of new stationary NO $^2$ sources to assist in maintaining the standard and in reference to fossil fuel generators is consistent with Federal New Source Performance Standards for emissions of nitrogen dioxide (40 CFR Part 60.44).

APC–18 represents a series of compliance schedules affecting the various sources of particulate matter. In all cases, the final compliance date was on or before May 31, 1975. Since approval of APC–18 at this late date would be purely academic, EPA will request the State to withdraw the regulation as a plan revision in accordance with comments submitted by the Technical Secretary of the APCB.

APC–20 addresses the control of fugitive dust emissions. Comments received from industry indicated a general dissatisfaction with the regulation because of vagueness and unenforceability. While EPA recognizes the desirability of including a fugitive dust emission limitation in an air quality implementation plan, the State has been advised of our reservations concerning the inclusion of a vague or ambiguous regulation in the Indiana Implementation Plan. State officials have indicated a willingness to clarify the ambiguities. In the interim EPA will approve APC–20 with the exception of section 2(d) relating to visible emission violations. State personnel have indicated that no person has ever been cited for violation solely of section 2(b). Accordingly, EPA will disapprove section 2(d) of APC–20 as unenforceable. This rulemaking will be effective immediately because no additional substantive requirements are imposed on parties.

APC–22 classifies all counties in the State as A, B, or C for each criteria pollutant. While EPA is not satisfied with the State's technical support of classifications for Co and NO₂, the priority county ratings for these two pollutants will be approved for reasons discussed above. Classifications for particulate, however, are unsupportable for the following reasons:

(1) Data to support the regulation is inadequate:

(2) Attainment of the National Ambient Air Quality Standards has not been addressed:

(3) Maintenance of the National Ambient Air Quality Standards has not been addressed.

Thus, this classification fails to meet the requirements of 40 CFR 51.3 and accordingly is disapproved.

Final rulemaking action on the ozone and sulfur dioxide county classifications will take place at the same time as actions of APC–15 and APC–13.

With the exception of the above-noted disapproval actions and material returned to the State or held in abeyance pending further review, the proposed revisions meet the substantive and procedural requirements of Section 110 of the Clean Air Act and 40 CFR Part 51 and are hereby approved as revisions, of the Indiana Implementation Plan, effective immediately.

A technical support document discussing the background for the decisions noted above is available for inspection in the Region V office of the U.S. Environmental Protection Agency, 230 South Dearborn, Chicago, Illinois 60604, and the Indiana State Air Pollution Control Board, State Board of Health, 1330 West Michigan Street, Indianapolis, Indiana 46206.

(42 USC 1857c–5(a))

Dated: October 21, 1975.

JOHN QUARLES,
*Acting Administrator.*

Part 52 of Chapter I, Title 40, of the Code of Federal Regulations is amended as follows:

1. Section 52.770 is amended by adding paragraph (d)(2) as follows:

§ 52.770  Identification of plan.

\*　\*　\*　\*　\*　\*

(d) \* \* \*

(2) March 7, 1974, October 3, 1974 and November 8, 1974 the Technical Secretary of the Air Pollution Control Board acting for the Governor of Indiana.

2. Section 52.771 is amended by adding paragraph (b) as follows (the existing unlettered paragraph becomes paragraph (a)):

§ 52.771  Classification of regions.

\*　\*　\*　\*　\*　\*

(b) The requirements of 51.3(a) of this chapter are not met by the classification of counties in APC–22 for the purposes of attainment and maintenance of the total suspended particulate ambient air quality standards.

3. Section 52.776 is amended by adding paragraph (c) as follows:

§ 52.776  Control strategy.  Particulate matters.

\*　\*　\*　\*　\*　\*

(c) APC–3 of Indiana's Air Pollution Control Regulations (visible emission limitation) is disapproved insofar as the phrase "for more than a cumulative total of 15 minutes in a 24-hour period" will interfere with attainment and maintenance of particulate standards.

4. Section 52.781 is amended by adding paragraph (e) as follows:

§ 52.781  Rules and regulations.

\*　\*　\*　\*　\*　\*

(e) Section 2(d) of APC–20.  Fugitive Dust Emissions, is disapproved because it is unenforceable within the terms of the regulation.

5. Section 52.792 is added as follows:

§ 52.792  Source surveillance.

(a) The requirements of 51.19(c) of this chapter are not met by the phrase "for more than a cumulative total of 15 minutes in a 24-hour period" contained in Section 1 of APC–3 of the Indiana Air Pollution Control Regulations.

[FR Doc. 75–28779 Filed 10–24–75; 8:45 am]