836 F.2d 777
 26 ERC 2049, 56 USLW 2369, 18 Envtl.
L. Rep. 20,249
 CONCERNED CITIZENS OF BRIDESBURG and Delaware Valley
Citizens' Council for Clean Air, Petitioners,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Lee M.
Thomas, Administrator, United States Environmental
Protection Agency, Respondents.
 No. 86-3380.
 United States Court of Appeals,
Third Circuit.
 Argued May 22, 1987.
Decided Dec. 18, 1987.
 
 Jerome Balter (Argued), Public Interest Law Center of Philadelphia, Joseph Otis Minott, Philadelphia, Pa., for petitioners.
 F. Henry Habicht, II, Asst. Atty. Gen., Land & Natural Resources Div., Bradley S. Bridgewater (Argued), U.S. Dept. of Justice, Land and Environmental Resouces Div., Environmental Defense Section, Washington, D.C., Kendra Sagoff, Office of General Counsel, E.P.A., Washington, D.C., Robert J. Smolski, U.S. E.P.A., Philadelphia, Pa., for respondents.
 Handsel B. Minyard, City Solicitor, Denise D. Colliers, Divisional Deputy City Solicitor, Frederick C. Bader, Asst. City Sol., Philadelphia, Pa., for the City of Philadelphia, amicus curiae on behalf of respondents.
 Before SLOVITER, BECKER and GARTH, Circuit Judges.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 The Clean Air Act, 42 U.S.C. Secs. 7401-28 (1982) ("the Act"), "creates a partnership between the states and the federal government": the federal government, through the Environmental Protection Agency ("EPA"), determines the ends--the standards of air quality--while the states are given the initiative and broad responsibility to determine the means to achieve those ends. Bethlehem Steel Corp. v. Gorsuch, 742 F.2d 1028, 1036 (7th Cir.1984). Thus, under Part A of the Act, states have the primary authority for establishing a specific plan, known as a State Implementation Plan ("SIP"), for achieving and maintaining acceptable levels of air pollutants in the atmosphere. The EPA sets those levels through National Ambient Air Quality Standards ("NAAQS"). The EPA may also, for limited reasons, demand revisions in a SIP. But because of the state's primacy over the terms of the SIP, the Act requires the EPA, before modifying the SIP, to suggest proposed revisions to the state, which must then hold public hearings and respond. Only if the state does not suitably respond may the EPA alter the terms of a plan itself. See Bethlehem Steel Corp. v. EPA, 723 F.2d 1303, 1309-10 (7th Cir.1983).
 
 
 2
 This petition for review, brought by two citizens groups, challenges an EPA final rule rescinding fourteen state and local odor regulations contained in the Pennsylvania SIP. The EPA has not set NAAQS for odors, and claims that the odor regulations have no significant relationship to the achievement of any other NAAQS. The EPA therefore contends that it lacks statutory authority to include odor regulations in a SIP. The citizens groups disagree, on the ground that the odor regulations assist the state regulation of pollutants for which the EPA has set standards.
 
 
 3
 We do not reach this challenge, however, because we agree with the citizens groups' threshold claim that the EPA had a statutory obligation to propose its revisions to Pennsylvania for a hearing and reaction before directly deleting the odor regulations. The EPA contends that these procedures were not necessary because the removal of the odor regulations was not a SIP revision but was merely a correction of an EPA error made thirteen years before. According to the EPA, a revision occurs only when the EPA imposes obligations on the state, not when the EPA determines that portions of a SIP lie outside statutory authority.
 
 
 4
 We disagree. Although the question is not free from difficulty, because Congress apparently did not contemplate the need for revisions on the grounds cited by the EPA here, we read the statute to require that all SIP modifications occur through the designated revision procedure. Although the EPA action does not impose requirements on the state, the state may make a SIP more stringent than necessary to achieve NAAQS. See Union Electric Co. v. EPA, 427 U.S. 246, 262-65, 96 S.Ct. 2518, 2527-29, 49 L.Ed.2d 474 (1976). Therefore, instead of merely deleting its odor regulations, Pennsylvania might have attempted to tailor them more narrowly to pollutants that are regulated nationally, or it could have compensated for the deletion of odor regulations by strengthening other portions of the SIP.
 
 
 5
 Furthermore, the modification involved here was no inadvertent mistake. The EPA not only approved the SIP odor provisions at issue here, but twice approved modifications to them without suggesting that odor regulations as a whole are unauthorized. The policy of rejecting odor regulations arose years later. An attempt to change a SIP thirteen years after its creation, particularly when it results from a wholesale policy change in the interim, cannot be exempted from procedural requirements on the grounds that it is the correction of a mistake.
 
 
 6
 For these reasons, explicated more fully below, we grant the petition for review and remand so that the EPA can propose the SIP revisions to Pennsylvania and for Pennsylvania to hold the mandated public hearing.
 
 I. STATUTORY STRUCTURE
 
 7
 The portion of the Act that concerns us in this case came into existence in the Clean Air Amendments of 1970, Pub.L. No. 91-604, 84 Stat. 1676 (1970) ("the Amendments"). In essence, the Amendments, described in detail in Train v. Natural Resources Defense Council, 421 U.S. 60, 64-67, 95 S.Ct. 1470, 1474-76, 43 L.Ed.2d 731 (1975), require the EPA to publish a list of specific air pollutants which, in the Administrator's judgment, contribute to air pollution and which endanger the public health or welfare. 42 U.S.C. Sec. 7408. The EPA is also required to issue air quality criteria for each of these pollutants, 42 U.S.C. Sec. 7408(a)(2), and to prescribe primary and secondary NAAQS therefor. 42 U.S.C. Sec. 7409. These NAAQS require that states lower the concentration of certain pollutants in the outdoor air below levels that the EPA has deemed dangerous to public health or welfare. Since 1970, the EPA has established NAAQS for six "criteria pollutants": particulate matter, sulfur dioxide, carbon monoxide, nitrogen dioxide, ozone, and lead. See 40 C.F.R. Secs. 50.1-50.12 (1986). The EPA has not listed "odors" as one of the dangerous pollutants, nor has it established any standard for odors.
 
 
 8
 Although the Amendments required states to attain air quality of federally specified standards within a federally specified period of time, the Amendments retained "the premise of the earlier Clean Air Act 'that the prevention and control of air pollution at its source is the primary responsibility of States and local governments.' " Train, 421 U.S. at 64, 95 S.Ct. at 1474 (quoting Air Quality Act of 1967, 81 Stat. 485 (now codified at 42 U.S.C. Sec. 7401(a)(3))). Thus, the Amendments left the mechanics of achieving NAAQS to the states. Section 7410(a) requires each state to formulate and submit to the EPA a SIP detailing regulations and source-by-source emissions limitations that will conform the air quality within its boundaries to the NAAQS. The SIP basically embodies a set of choices regarding such matters as transportation, zoning and industrial development that the state makes for itself in attempting to reach the NAAQS with minimum dislocation.
 
 
 9
 Because the states have primary responsibility for achieving air quality standards, the EPA has limited authority to reject a SIP. Section 7410(a)(2) requires the Administrator to approve a SIP if "it was adopted after reasonable notice and hearing" and if it meets the eleven additional requirements of Sec. 7410(a)(2)(A)-(K). These requirements serve principally to assure that the state attains the NAAQS quickly.
 
 
 10
 The Act gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of Sec. [7410(a)(2) ], and the Agency may devise and promulgate a specific plan of its own only if a State fails to submit an implementation plan which satisfies those standards [Sec. 7410(c) ].
 
 
 11
 Train, 421 U.S. at 79, 95 S.Ct. at 1482. Indeed, "the States may adopt ... more rigorous emission standards, and the Administrator must approve plans containing them if the minimum federal requirements are satisfied." Union Electric Co., 427 U.S. at 262 n. 9, 96 S.Ct. at 2528 n. 9. Once the EPA approves regulations contained in a SIP, the state and federal governments have obligations to enforce them, 42 U.S.C. Sec. 7413, and private citizens may enforce them through citizen suits, for which they may obtain attorney's fees if successful, 42 U.S.C. Sec. 7604.
 
 
 12
 In addition to placing primary responsibility on the states to create SIPs, the Act also places primary responsibility on the states for their revision. Thus, Sec. 7410(a)(2)(H) requires a SIP to provide for its own revision under certain circumstances. The EPA's authority to approve or reject these revisions is as limited as its authority to reject the SIP originally. It must approve the revision if it meets the general requirements of Sec. 7410(a)(2), which are the requirements imposed on the original SIP, and if it "has been adopted by the State after reasonable notice and public hearings." 42 U.S.C. Sec. 7410(a)(3)(A). Only if the state fails to respond within sixty days to a proposal for revisions by the EPA may the EPA proceed to revise the SIP itself "after consideration of any State hearing record" or after its own public hearings. 42 U.S.C. Sec. 7410(c)(1).
 
 
 13
 II. THE PENNSYLVANIA ODOR REGULATIONS AND THE ADMINISTRATIVE
 
 PROCEEDINGS IN THE PRESENT CASE
 
 14
 Pennsylvania's Department of Environmental Resources submitted most of the odor regulations at issue in this case as part of its original SIP proposal to the EPA on January 27, 1972.[1] As the word "odor" suggests, these regulations regulate "smells or aromas" and in substance restrict or prohibit the discharge of odors that seriously offend people in the neighborhood because of inherent chemical or physical properties of the emission.[2] The EPA approved these regulations in May of that year. See 37 Fed.Reg. 10,889 (May 31, 1972).[3] In addition, the EPA has, on two additional occasions, taken action regarding the Pennsylvania SIP without objecting to the presence of the odor regulations.[4]
 
 
 15
 In 1977, Congress directed the EPA to study the health effects of odorous emissions and the feasibility of prescribing criteria and NAAQS for them under Sec. 7409 of the Clean Air Act. See Pub.L. No. 95-95, Sec. 403(b), 91 Stat. 792 (1977) (not codified). After studying the issue, the EPA, in 1980, recommended against listing offensive odors produced by industrial emissions as criteria pollutants.[5] The EPA also recommended against further approval of odor emission regulations contained in proposed SIPs. The bases of this recommendation were that: (1) odors are not caused by a single pollutant, thus it would be difficult to associate a specific health or welfare effect with a given odor concentration; (2) it would be difficult to develop objective standards for measuring the offensiveness of odors; (3) state and local odor controls and procedures were adequate; and (4) regulations that attempted to detect high concentrations of harmful pollutants based upon odor sensitivity would be overinclusive--i.e., they would prohibit a number of odorous emissions that are not harmful to the public health. See Office of Air, Noise and Radiation & Office of Air Quality Planning and Standards, U.S. EPA, Regulatory Option for the Control of Odors 5, 69-72 (1980).
 
 
 16
 Thus, after 1980, the EPA's policy toward odor regulation changed. Although the EPA had previously approved SIPs that contained odor regulations, it now declined to approve similar proposals.[6] In April 1983, the EPA notified the Pennsylvania Department of Environmental Resources that its earlier approval of odor regulations was in error and that it would not continue to enforce these regulations.[7] However, the EPA did not at that time proceed formally to remove the odor regulations.
 
 
 17
 The EPA's decision to formally withdraw its approval of the odor regulations in the Pennsylvania SIP appears to have been triggered by a federal district court complaint brought by one of the petitioners in this case. See Concerned Citizens of Bridesburg v. City of Philadelphia, 643 F.Supp. 713 (E.D.Pa.1986). In that case, Concerned Citizens, consisting of residents of an industrial neighborhood in Northeast Philadelphia, asserted both federal and state claims seeking to enforce the odor emission regulations of the Pennsylvania SIP against Philadelphia's Northeast Water Pollution Control Plant. At the request of the District Court, the EPA filed an amicus brief in which it indicated that its previous approval of the odor regulations had been inadvertent. Furthermore, the EPA stated that because the odor regulations bore "no relation to attainment or maintenance of the [NAAQS]," it planned to withdraw its prior approval and formally delete the odor regulations from the SIP. EPA Amicus Brief at 5, Concerned Citizens of Bridesburg, 643 F.Supp. 713 (E.D.Pa.1986) (No. 85-14).
 
 
 18
 In August, 1985, before the decision in the Concerned Citizens district court case, the EPA published notice of its intent to delete the odor regulations from the Pennsylvania SIP. 50 Fed.Reg. 32,451 (Aug. 12, 1985). During the next nine months, the EPA received forty-five public comments to its proposal, thirty-nine of which opposed the EPA action.[8] Comments filed by Concerned Citizens of Bridesburg contended that the EPA could not remove the odor regulations so long as they are "related directly or indirectly to any EPA criteria pollutant." J.A. at 451a. Concerned Citizens claimed that the odor regulations have a "direct relationship" to the regulation of sulfur dioxide and nitrogen dioxide and an "indirect" relationship to the regulation of ozone. J.A. at 449a-50a.
 
 
 19
 In May of 1986, the EPA responded to the public comments, and issued its final rule withdrawing the odor regulations from the Pennsylvania SIP without holding a public hearing. The EPA responded specifically to the comments of petitioners' counsel, noting that the odor regulations at issue were far too broad and general, encompassing both criteria and non-criteria pollutants. The EPA's final rule pointed out that "[m]any harmless substances cause odors," while "a substance may be carcinogenic but odorless," 51 Fed.Reg. 18,438, 18,439 (May 20, 1986). The EPA noted that odors are caused not by a single pollutant, but by "combinations of numerous odorants"; and that individual sensitivity and responses to odors are also highly subjective and highly variable. EPA, Technical Support Document No. AM045PA at 7-8 (Dec. 24, 1985).[9] The EPA concluded that the odor regulations "should not be included in the Pennsylvania SIP because they bear no significant relation to attainment and maintenance of the [NAAQS]." 51 Fed.Reg. at 18,438. The EPA stated, however, that it did not preclude Pennsylvania from submitting revised odor regulations that were "quantifiable [and] specific" and "which, when implemented, demonstrate reductions in emissions which would significantly contribute to attainment or maintenance of a NAAQS." Id. at 18,440.[10] Within sixty days, Concerned Citizens and another citizens group, the Delaware Valley Citizens' Council for Clean Air, brought this petition for review under 42 U.S.C. Sec. 7607(b).[11]III. DISCUSSION
 
 
 20
 Petitioners present both procedural and substantive claims. Procedurally, they claim that the EPA violated statutory requirements by failing to propose the SIP revision to Pennsylvania and by failing to hold a public hearing. Substantively, they claim that the EPA has no authority to reject Pennsylvania's odor regulations, because those regulations are significantly related to the NAAQS and because they otherwise satisfy the requirements of Sec. 7410(a)(2). Finally, in a mixed substantive and procedural claim, petitioners contend that the EPA has failed to provide a sufficient explanation for its change in policy toward odor regulations. Because we agree with petitioners' purely procedural claim that the EPA should have submitted these proposed regulations to the state and held a hearing, we need not reach petitioners' other contentions.
 
 A.
 
 21
 We begin with a background reference to the various sections of the Clean Air Act bearing upon the procedure for revising a SIP. Section 7410(a)(2)(H) requires the state to have a provision for revising its SIP. Section 7410(a)(3)(A) requires the EPA to approve a revision proposed by the state so long as it meets the basic requirements of a SIP and so long as the state adopted the revision after "reasonable notice and public hearings." And Sec. 7410(c)(1) provides that:
 
 
 22
 The Administrator shall, after consideration of any State hearing record, promptly prepare and publish proposed regulations setting forth an implementation plan, or portion thereof, for a State if--
 
 
 23
 ... (C) the State fails, within 60 days after notification by the Administrator or such longer period as he may prescribe, to revise an implementation plan as required pursuant to a provision of its plan referred to in subsection (a)(2)(H) of this section.
 
 
 24
 42 U.S.C. Sec. 7410(c)(1). Because of these sections, all parties agree that if the EPA has effected a "revision" in the Pennsylvania SIP (or, as the EPA puts it, "a new SIP for Pennsylvania," Resp. Br. at 40) within the meaning of these sections, it has done so improperly, for it should have proposed the revision to the state for the state to conduct a hearing.
 
 B.
 
 25
 In response to petitioners' contentions, the EPA claims that its deletion of the odor regulations does not constitute a revision of the SIP but merely "a revision of EPA's own prior action." Resp. Br. at 40. It submits that "the final rule constitutes EPA's effort not to promulgate a new SIP for Pennsylvania, but to bring EPA's exercise of approval authority into conformity with law." Id. The EPA now believes the odor regulations to be outside its authority under the Clean Air Act. In support of this contention, the EPA points to the specific phrasing of Sec. 7410(a)(2)(H), the subsection that requires a SIP to provide for its own revision. The section states that the SIP must provide for revision:
 
 
 26
 (i) from time to time as may be necessary to take account of revisions of [NAAQS] or the availability of improved or more expeditious methods of achieving such primary or secondary standard; or (ii) ... whenever the Administrator [of the EPA] finds on the basis of information available to him that the plan is substantially inadequate to achieve the [NAAQS] which it implements or to otherwise comply with any additional requirements established under the Clean Air Act Amendments of 1977.
 
 
 27
 42 U.S.C. Sec. 7410(a)(2)(H). The EPA contends that the change in the SIP sub judice has occurred for none of the purposes spelled out in this section: no NAAQS has been changed; no improved or more expeditious methods or technologies have become available; and the EPA has not found the Pennsylvania SIP substantially inadequate to achieve an NAAQS. Contending that this section defines the meaning of "revision," the EPA claims that its actions do not amount to a revision, and that it therefore need not comply with the procedural requirements of those sections dealing with SIP revisions.
 
 
 28
 We reject the EPA's contentions first because we believe that the revision sections are applicable to the SIP modification undertaken in this case. As a matter of plain English usage, the term revision encompasses any modification in the requirements of a plan, including "a change in the plan itself which deletes [a] requirement." Train, 421 U.S. at 89, 95 S.Ct. at 1487. Indeed, the EPA's own description of its action indicates the appropriateness of the term revision to the changes in the Pennsylvania SIP. The Federal Register notice of the Final Rule is entitled: "Commonwealth of Pennsylvania; Approval of Revision to the Pennsylvania State Implementation Plan." See 51 Fed.Reg. at 18,438 (emphasis added).
 
 
 29
 This common understanding also fits within the statutory structure. The sections dealing with SIP revisions complement the sections dealing with a SIP's original creation. In either situation, the state has an opportunity to pass first upon the mechanics of achieving compliance with air quality standards, and the statutory structure reveals no reason why the modifications undertaken here should be treated in a different fashion.
 
 
 30
 We agree that Sec. 7410(a)(2)(H), which requires a SIP to provide for its own revision for certain broad enumerated reasons, does not specifically address the situation here--a change required because the EPA no longer considers a portion of a SIP related to the NAAQS. We note, however, that Sec. 7410(a)(2) as a whole, which not only contains the revision provision but which enumerates the ground on which the EPA may reject a portion of a SIP, also fails specifically to authorize the EPA to reject a portion of a SIP on the grounds that it is unrelated to an NAAQS. If we were to construe Sec. 7410(a)(2)(H) as narrowly as the EPA would like, logic would compel us to construe Sec. 7410(a)(2) just as narrowly. That, however, is a position that the EPA does not advance and one with which we suspect it would be uncomfortable. Such a construction would suggest that the EPA does not have to propose a revision on this ground to a state, but it would also suggest that the EPA cannot require such a revision at all. Such a construction would allow the EPA to reject a portion of a SIP only for grounds enumerated in (a)(2). The grounds relied upon by the EPA here, however, are not so enumerated.
 
 
 31
 We believe that Congress simply did not contemplate that SIPs might include matters unrelated to NAAQS; it therefore neither specifically authorized the EPA to reject a portion of a SIP on that ground, nor required that SIPs include provisions for their own revision on that ground. Section 7410(a)(2)(H) does, however, seem to include all the reasons for revision contemplated by Congress, including changes in EPA policy. Thus, although there is no evidence Congress contemplated the kind of revision at issue here, subsections 7410(a)(2)(H), (a)(3)(A), and (c)(1) establish a fundamental design of Clean Air Act enforcement that would be disrupted by the result the EPA now advances. Attempting to fit this particular action within the most appropriate section of the statute, considering the statutory structure and the plain meaning of the word "revision," we believe that the EPA's action here may best be described as a revision.
 
 C.
 
 32
 Not only does the proposed action well fit the revision provisions, but the statute also does not provide any authority for modifying an existing SIP other than through the revision provisions. Faced with this problem, the EPA has offered two possible sources of authority for modifying the SIP without proposing the modification to the state. Neither of these suggestions, however, is convincing.
 
 
 33
 First, the EPA asserts that "it is an established principle of administrative law that an agency's power to reconsider is 'inherent in the power to decide.' " Resp. Br. at 44 n. 17 (citing cases). See Trujillo v. General Electric Co., 621 F.2d 1084, 1086 (10th Cir.1980); United States v. Sioux Tribe, 616 F.2d 485, 493, 222 Ct.Cl. 421, cert. denied, 446 U.S. 953, 100 S.Ct. 2420, 64 L.Ed.2d 810 (1980). The EPA claims that it is here using this inherent authority to correct an inadvertent mistake.
 
 
 34
 Any implicit authority to reconsider, however, must be limited by the original grant of authority. Because Sec. 7410(a)(2) requires the Administrator to approve or disapprove of a plan "within four months," that time period must place at least reasonable limits on the Administrator's authority to reconsider. A change after thirteen years is a fortiori a revision. Moreover, in Detroit Edison Co. v. EPA, 496 F.2d 244, 248-49 (6th Cir.1974), the court held that a proposed "clarification" by the EPA of a SIP coming six months after promulgation was not a "clarification" but a revision, because it effected substantial change.
 
 
 35
 Neither are we persuaded by the EPA's reference to the revisions as "corrections" and its reference to the original approvals as "inadvertent." We are not dealing here with typographical errors. The EPA approved whole provisions some thirteen years ago and then twice approved modifications of the odor provisions without suggesting that odor regulations as a whole are unauthorized. In order for the EPA's 1972 approval of Pennsylvania's odor regulations to have been inadvertent, the EPA's policy at these times would have to have been that odor regulations do not contribute to attainment of the NAAQS and that the Agency would not approve them. The record reveals that no such EPA policy existed in 1972. Not until 1980, when it completed the study of odor regulations requested by Congress, did the EPA adopt the policy that it did not have authority to approve odor regulations submitted as part of SIPs. Thus, in 1979 the EPA approved Pennsylvania's proposed changes to its odor regulations, 44 Fed.Reg. 73,031 (Dec. 17, 1979), but in 1981 and 1982, the EPA declined to approve the odor regulations of Guam, Nevada, and Iowa. We have here a clear change in policy, which thus should not be exempted on the ground that it is a revision. Detroit Edison reaches the same result on a change that much more plausibly was the result of a mere oversight.
 
 
 36
 At oral argument, counsel for the EPA also suggested that Sec. 7410(c) provides authority for the EPA's action on the ground that it was a promulgation of a portion of a SIP. That section states:
 
 
 37
 (1) The Administrator shall, after consideration of any State hearing record, promptly prepare and publish proposed regulations setting forth an implementation plan, or portion thereof, for a State if ... (B) the plan, or any portion thereof, submitted for such State is determined by the Administrator not to be in accordance with the requirements of this section.
 
 
 38
 45 U.S.C. Sec. 7410(c). Because the EPA does not have to submit such actions first to the state, counsel suggests that by viewing the deletion of odor regulations as a promulgation of a portion of the SIP, we should not find any procedural error.
 
 
 39
 We note preliminarily that even if we were to agree with the EPA's reading of Sec. 7410(c)(1)(B), the Act still requires the Agency to hold a public hearing before "promulgating" its own portion of the plan. 42 U.S.C. Sec. 7607(d)(1), (5). The Agency concedes that it held no such hearing. That fact itself might require granting the petition. It also suggests that the EPA, as opposed to its counsel, did not consider its actions a plan promulgation under Sec. 7410(c)(1)(B). More importantly, we believe that when the EPA promulgates a SIP for a state because the state's plan does not meet statutory requirements, it must act before it has approved the state's plan, not thirteen years later. See 42 U.S.C. Sec. 7410(c)(1) (contemplating preparation of a plan by the EPA when the EPA finds a proposed SIP unsatisfactory, not a previously approved SIP). Thus, the EPA can issue a portion of a plan to replace one proposed by the state only if it has rejected that portion of the state's plan. Id. But under Sec. 7410(a)(2), the EPA can only reject a portion of a plan within four months of its submission, which the EPA did not do. Thus, the EPA's action here is not a promulgation of a portion of a plan within the meaning of Sec. 7410(c).[12]
 
 
 40
 In sum, the Clean Air Act is a comprehensive statute that attempts to enumerate all of the EPA's powers concerning SIPs. The absence of any other source of statutory authority for modifying a SIP requires that the EPA accomplish its modification through the use of the "revision" provisions. The EPA cannot create a new method of modifying a SIP in order to avoid the label "revision." If the EPA is dissatisfied with a SIP or a portion of it, then it must either initiate the process for revising the SIP or initiate the process for promulgating a new SIP that addresses the deficiencies in the earlier one.
 
 D.
 
 41
 In addition to the specific statutory arguments, the EPA also presents a broader, philosophical argument. It contends that we should not construe the deletion of odor regulations to require initial consideration by Pennsylvania because the EPA "did not direct or limit the power or authority of the state in any way." Resp. Br. at 42. The rules constituting the SIP remain valid state regulations. No new terms or provisions have been added to the SIP by virtue of the final rule, nor are such necessary for the SIP to meet the requirements of Sec. 7410. All that the EPA has done, it claims, is to tell "Pennsylvania what EPA itself cannot do under the Clean Air Act." Id. at 43. The "SIP continues to be a creature of the state in the first instance, not of EPA." Id. at 41.
 
 
 42
 We reject this argument, however, because even if the deletion of odor regulations does not impose any requirement on the state, the state is entitled to include in a SIP provisions that go beyond the minimal requirements of the NAAQS. In this way it may impose enforcement obligations on the EPA and on the federal courts. See Union Electric Co. v. EPA, 515 F.2d 206, 211 (8th Cir.1975), aff'd, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976).[13]
 
 
 43
 Petitioners have contended that the odor regulations do help to regulate air pollutants that are regulated by NAAQS; petitioners claim that by attacking particular periods of high emissions that cause odors, the odor regulations restrict pollutants in ways not done by the other non-odor regulations, which work more through general averages. While not objecting to the deletion of the odor regulations, the Director of the Pennsylvania Department of Environmental Resources also indicated that the Department considered the odor regulations an adjunct to regulation of ozone and sulfur compounds. See supra n. 8. The EPA notice itself stated that it might accept "quantifiable, specific odor regulations" that might assist in the control of federally regulated pollutants. 51 Fed.Reg. at 18,440.
 
 
 44
 Thus, even if the EPA may require Pennsylvania to delete its present odor regulations, Pennsylvania might choose to offer more narrowly tailored regulations that meet EPA requirements or it might wish to compensate for the loss of the odor regulations by strengthening other requirements. Consistent with the structure of the Clean Air Act, Pennsylvania should have had the opportunity to consider the proposed revisions before their promulgation by the EPA.
 
 IV. HARMLESS ERROR
 
 45
 Because the EPA's promulgation of the final rule deleting all odor regulations from the Pennsylvania SIP was a revision of that SIP, Sec. 7607(d) applies. See 42 U.S.C. Sec. 7607(d)(1)(A). Under Sec. 7607(d)(8) this Court cannot reverse an EPA rule because of a procedural error unless the error was "so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made." 42 U.S.C. Sec. 7607(d)(8). The EPA and the City of Philadelphia, amicus curiae, claim that no such likelihood is present here.
 
 
 46
 Reviewing courts have found Sec. 7607(d)(8) problematic. As the Court of Appeals for the District of Columbia Circuit has pointed out, this provision originated in the House of Representatives in conjunction with a provision in its 1977 bill requiring the EPA to permit parties to cross-examine witnesses about adjudicative facts. See Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 521-23 (D.C.Cir.1983) (citing H.R. 6161, 95th Cong., 1st Sess. Sec. 305(a), Sec. 307(d)(5)(B) (1977), reprinted in 4 Environmental Policy Division, Congressional Research Service, A Legislative History of the Clean Air Act Amendments of 1977, at 2220, 2431 (Comm.Print 1978)). Because the House didnot wish to accord such rights in testimony concerning legislative facts and because the House foresaw many possible disputes over whether facts were adjudicative or legislative, the House built in protections to assure that agency rulemaking would not easily be reversed for such reasons.[14] 705 F.2d at 522. When the Conference Committee deleted the cross-examination requirement, it left in the limits on procedural review. "These limits," however, "are not mentioned in either the Conference Report or in the House and Senate debates on the Conference Committee bill. So far as appears, Congress never considered their residual meaning once the right to cross-examination was gone." Id.
 
 
 47
 Because other portions of the legislative record indicated that Congress did not intend to cut back on the procedural requirements of the Administrative Procedure Act, 5 U.S.C. Secs. 551-706 (1982) ("APA"), the Small Refiner court concluded that violations of the Clean Air Act that also violate the APA should be reversed. Id. at 523, 543-44. Regarding the additional requirements of the Clean Air Act, all the court could conclude was that Sec. 7607(d)(8) "sets a restrictive tone" that the " 'EPA's rulemaking not be casually overturned for procedural reasons.' " Id. at 523 (quoting Sierra Club v. Costle, 657 F.2d 298, 391 (D.C.Cir.1981)).
 
 
 48
 In this case, the EPA's "procedural" violations involve its failure to propose the revisions to the state and the failure to hold a public hearing, either through the state or on its own. See 42 U.S.C. Sec. 7410(a)(3)(A), (c)(1). If we were to follow Small Refiner, therefore, the denial of a hearing alone would require grant of the petition. Cf. 5 U.S.C. Sec. 553 ("When rules are required by statute to be made on the record after an opportunity for an agency hearing," and that hearing is not held, an agency has violated the APA.). Such a result makes particular sense in light of the value of a public hearing reflected in the repeated statutory requirement that all actions affecting SIP provisions occur after a public hearing. See 42 U.S.C. Sec. 7410(a)(2) (Administrator shall adopt SIP if it meets other requirements and was adopted after a hearing); Sec. 7410(a)(3)(A) (Administrator shall adopt revision if adopted by the state after reasonable notice and public hearings); Sec. 7410(c)(1) (in promulgating SIP, portion of SIP or revision, Administrator must consider state hearing record, or, if state did not hold hearing, hold hearing); Sec. 7607(d)(5) (in promulgating rules, Administrator must provide opportunity for oral presentations).
 
 
 49
 We need not rest our decision on this ground alone, however, for we agree with Judge Posner that a failure to propose a revision to a state is far more "than a procedural bobble." Bethlehem Steel Corp., 742 F.2d at 1036. Such a failure bears little similarity to a failure to permit cross-examination, for it goes to the division of authority between the federal government and the state. "The Clean Air Act is an experiment in federalism, and the EPA may not run roughshod over the procedural prerogatives that the Act has reserved to the states." Id. We hold that such failures simply are not the kinds of procedural errors subject to harmless error review. Cf. Sierra Club v. Indiana-Kentucky Electric Corp., 716 F.2d 1145, 1153-54 (7th Cir.1983) (SIP promulgated by state in violation of state procedure is invalid even after accepted by EPA).
 
 
 50
 Even if we were to view the EPA's errors as purely procedural, we find a substantial possibility that proposal of the regulations to the Commonwealth of Pennsylvania might result in differences in the SIP. As we have noted above, see supra n. 8, resolutions passed by the City Council of Philadelphia and the House of Representatives of the Commonwealth opposed the revision of the odor regulations. The Pennsylvania Department of Environmental Resources also pointed out both that it considered the odor regulations relevant to regulating federally restricted air pollutants and that "problems could arise for the Commonwealth as the result of no EPA backing for the Department's odor control efforts." J.A. at 404a. Although Pennsylvania could propose new regulations today, Congress's requirement that a state hold a public hearing before adopting revisions demonstrates that Congress was aware that hearings influence both the likelihood that decisions will be changed and the substance of the decisions themselves. In short, by fully airing issues, hearings influence the substance of decisionmaking. If faced with its own public hearings, Pennsylvania might very well have proposed regulations that might at least continue some of the effect of its odor regulations. Moreover, Pennsylvania might very well make other requirements in its SIP more stringent to compensate for the loss of odor regulations.
 
 
 51
 In sum, the requirements for state consideration of revisions and for public hearings before any revision are too basic to the statute for us to consider the failure to follow them harmless.
 
 V. CONCLUSION
 
 52
 For the foregoing reasons, the petition for review will be granted and the case remanded to the EPA for proceedings consistent with this opinion.
 
 
 
 [1]
 For a list of the statutes and regulations pertaining to odor emission control that were affected by the EPA's final rule, see 51 Fed.Reg. 18,438 (May 20, 1986)
 
 
 [2]
 For example, the Philadelphia Air Management Code, which is included in the SIP, defines odors as follows:
 Odors--Smells or aromas which are unpleasant to persons, or which tend to lessen human food and water intake, interfere with sleep, upset appetite, produce irritation of the upper respiratory tract, or create symptoms of nausea, or which by their inherent chemical or physical nature, or method of processing, are or may be detrimental or dangerous to health. Odors and smell are used herein interchangeably.
 Philadelphia Air Management Code Sec. 3-102(25).
 
 
 [3]
 In view of the fact that we do not reach the substantive contentions made by the parties, we need not decide exactly what the regulations permit or forbid
 
 
 [4]
 See 38 Fed.Reg. 32,884 (Nov. 28, 1973); 45 Fed.Reg. 56,060 (Aug. 20, 1980)
 
 
 [5]
 See Office of Air, Noise and Radiation & Office of Air Quality Planning and Standards, U.S. EPA, Regulatory Option for the Control of Odors (1980)
 
 
 [6]
 See, e.g., 46 Fed.Reg. 26,303 (May 12, 1981) (taking no action on odor regulations in Guam SIP); 46 Fed.Reg. 43,141 (Aug. 27, 1981) (taking no action on odor regulations in Nevada SIP); 47 Fed.Reg. 22,53 1 (May 25, 1982) (taking no action on Iowa odor regulations where odor regulations were not included in SIP)
 
 
 [7]
 See Letter from EPA to James Salvaggio, Chief of Planning Section, Pennsylvania Department of Environmental Resources, Bureau of Air Quality Control (Apr. 1, 1983)
 
 
 [8]
 The Philadelphia City Council held a hearing on EPA's proposal and then adopted Resolution No. 576 (Oct. 10, 1985) in opposition. However, the Philadelphia City Solicitor, who was defending the Concerned Citizens district court suit, supported the proposal. The Pennsylvania House of Representatives passed Resolution No. 165 (Oct. 23, 1985) opposing the EPA's proposed action. However, the Pennsylvania Department of Environmental Resources did not object. We note, however, that the Department disagreed with the proposal:
 The Department does not agree that the odor regulation is unimportant in attaining and maintaining the ambient standards. The odor regulations are used as an adjunct to the VOC regulations and provide an additional avenue for addressing VOC emissions. This is especially true in our involvement with smaller sources which emit VOC at levels less than the Section 129.52 de minimis level.
 The withdrawal of the SIP approval is inconsistent with EPA's requirement for the Commonwealth to adopt regulations for control of total reduced sulfur (TRS) compounds from kraft pulp mills. The levels of these compounds in the areas of the sources do not appear to be of consequence with respect to the health of residents in the area. The control of TRS emissions is related solely to reduction of odors. J.A. at 404.
 Letter from James K. Hambright, Director, Bureau of Air Quality Control, Pennsylvania Department of Environmental Resources, to Donna Abrams, Region III, Air Management Division, U.S. E.P.A. (Sept. 15, 1985).
 
 
 [9]
 The EPA pointed out further that even if the odor regulations did happen to be applied to criteria pollutants, as to sulfur dioxide and nitrogen dioxide, the odor thresholds were far in excess of the NAAQS for those pollutants, and thus regulations based solely on odor were ineffective in enforcing the NAAQS. EPA, Technical Support Document No. AM045PA at 7-8. As for the use of odor regulations to enforce the ozone NAAQS through control of volatile organic compounds, the EPA stated that it had not found any technical correlation between controlling odor levels of these compounds and the reduction in ozone levels. See 51 Fed.Reg. at 18,439
 
 
 [10]
 The EPA also emphasized that Pennsylvania had available on its books many other state and federal regulations "far more specific and effective" for controlling the emissions of concern here. Resp. Br. at 12
 
 
 [11]
 Subsequent to the commencement of this action, Judge VanArtsdalen filed an opinion in Concerned Citizens' district court case, enjoining the emission of odors from Philadelphia's Northeast Pollution Control Plant. See Concerned Citizens of Bridesburg v. City of Philadelphia, 643 F.Supp. 713 (E.D.Pa.1986). In light of the EPA's deletion of the odor regulations from the Pennsylvania SIP, however, the district court granted petitioner relief solely on its pendent state common law nuisance claim. Petitioner's claim for relief and attorneys' fees under Sec. 7604(d) was denied. The district court's amended order provided, however:
 In the event that the action of the EPA eliminating the State and city odor regulations from the Pennsylvania SIP is held invalid, the plaintiffs may then seek additional relief under the Clean Air Act, including the award of attorney's fees and costs pursuant to 42 U.S.C. Sec. 7604(d), and the Court shall thereupon determine whether any such requested additional relief shall be granted.
 Concerned Citizens of Bridesburg v. City of Philadelphia, No. 85-14, slip op. at 3 (E.D.Pa. August 21, 1986). Concerned Citizens' appeal, No. 87-1092, is pending before another panel of this court.
 
 
 [12]
 Although the parties have not cited it, Sec. 7410(i) (enacted by Pub.L. 95-95, Sec. 108(g), 91 Stat. 685 (1977), as subsection 7410(h), and redesignated subsection (i) by Pub.L. 95-190, Sec. 14(a)(5), 91 Stat. 1393 (1977)), may also require granting the petition. That section provides that outside of certain specific statutory methods, "no order, suspension, plan revision, or other action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the State or by the Administrator." Of those permissible methods, the only two possibly relevant here are a plan revision under Sec. 7410(a)(3) or a plan promulgation under Sec. 7410(c). If the SIP modification at issue here is "taken with respect to any stationary source," this section would require that the EPA treat the modification as a revision because we have held that the EPA may not treat it as a plan promulgation
 The SIP change here unquestionably affects stationary sources. Whether it is "taken with respect to" such a source depends on our construction of those words. Because the parties do not address this issue, however, we do not address it. We note, however, that this section appears to confirm what otherwise appears implicit in Part A of the Clean Air Act, namely that the Act attempts to enumerate an exhaustive list of the EPA's powers regarding SIPs. Lacking another statutory source of authority, the EPA must utilize the revision provisions to accomplish its purpose.
 
 
 [13]
 We also observe that the import of the EPA's argument is that although the regulations will not be enforced by it, they will be in place and may be enforced by state authorities. However, given that SIPs form an integrated regulatory approach, we are wary of the argument that by declining to enforce certain provisions the EPA has not directed or limited state authority
 
 
 [14]
 See generally Fed.R.Evid. 201 advisory committee's note (discussing legislative and adjudicative facts)